1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                         **DISTRICT OF NEVADA**
7
8    UNITED STATES OF AMERICA,                )
                                              )
9                              Plaintiff,     )      Case No.: 2:16-cr-00324-LRH-GWF
                                              )
10   vs.                                      )      **FINDINGS &**
                                              )      **RECOMMENDATIONS**
11                                            )
                                              )      **Re: Motion to Suppress (ECF No. 36)**
12   JESSIE MENDOZA,                          )
                                              )
13                             Defendant.     )
     _____)
14

15          This matter is before the Court on Defendant Jessie Mendoza's Motion to Suppress (ECF No.

16   36), filed on February 17, 2017.  The Government filed its Response (ECF No. 41) on March 3,

17   2017, and Defendant filed his Reply (ECF No. 42) on March 10, 2017.  The Court conducted an

18   evidentiary hearing on April 5, 2017 regarding whether the police lawfully stopped the vehicle

19   occupied by Defendant Mendoza on October 22, 2016.  Following that stop Defendant Mendoza was

20   arrested and his cell phone was seized.  The Court declined to conduct a broader evidentiary hearing

21   requested by Defendant pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978) because

22   it was doubtful that Defendant had satisfied the threshold showing required to obtain such a hearing.

23   The Court authorized the parties to file supplemental briefs as to whether a *Franks* evidentiary

24   hearing is warranted.  Defendant filed his Supplemental Motion to Suppress (ECF No. 63) on April

25   20, 2017.  The Government filed its Response (ECF No. 64) on April 28, 2017.

26   . . .

27   . . .

28   . . .

# BACKGROUND

1.    **October 21, 2016 Search Warrant for Buccal Swab.**

On October 21, 2016, Detective Justin Beveridge of the Las Vegas Metropolitan Police Department ("LVMPD") applied to a Clark County, Nevada justice-of-the-peace for a search warrant to obtain a buccal swab or blood sample from Defendant Jessie Mendoza. *Motion to Suppress* (ECF No. 36), *Exhibit B, October 21, 2016 Search Warrant Affidavit*.   The purpose of the warrant was to collect Defendant's DNA and compare it to DNA found on articles relating to a robbery.   Detective Beveridge stated that a series of armed robberies of EZ Pawn stores had begun on March 12, 2016. As many as six people would be involved in the robberies and they used stolen automobiles to commit the robberies.   When the robbers arrived at the EZ Pawn stores, between two and four robbers would exit stolen vehicles and enter the stores.   The robbers concealed their faces with masks or bandanas.   The robbers would smash out the jewelry cases and steal high value jewelry and watches.   One robber would always stand guard at the door with a black semi-automatic handgun. After committing the robberies, the robbers would drive the stolen vehicles to nearby drop-off areas where they would abandon the stolen vehicles and enter "layoff" vehicles.   *Exhibit B, Affidavit*, pgs. 563-64.

Detective Beveridge stated that the robbers robbed an EZ Pawn store in Las Vegas, Nevada on September 12, 2016.   Following that robbery, the robbers drove the stolen vehicle to a Mariana's grocery store parking lot.   Detectives were able to review the store's parking lot surveillance video and observe the robbers exit the stolen vehicle and enter a black Harley Davidson F-150 model pickup.   In the video, one of the robbery suspects was seen dropping clothing items and a hockey mask into the Mariana's trash dumpster.   Detectives recovered the clothing and mask from the dumpster "and confirmed through the EZ Pawn robbery video that the clothing was the same clothing worn by the suspects that committing the robbery."   DNA was collected from the clothing and the mask.   *Exhibit B, Affidavit*, pg. 564.

During the course of the investigation, detectives identified Jason Goldsby as one of the March 12, 2016 robbery suspects.   On October 7, 2016, detectives observed Goldsby, a juvenile identified as "D.P.," and two other identified individuals commit a robbery at an EZ Pawn store in

Henderson, Nevada.  At a subsequent interview, D.P. told the detectives that the person wearing the hockey mask in the September 12, 2016 robbery was named "Jess."  The detectives showed D.P. a photograph of Defendant Jessie Mendoza, who had previously been identified as an associate of Jason Goldsby.  "[D.P.] positively identified Mendoza as the person whom he knew as 'Jess' and that he was the gunman wearing the hockey mask on the 9/12/16 EZ Pawn robbery." *Exhibit B, Affidavit*, pg. 565.  Detective Beveridge further stated that "[i]n the 9/12/16 EZ Pawn robbery, the person wearing the hockey mask appears to be a Hispanic male with a shaved head and appears to be heavy set.  Photographs obtained from Facebook and Nevada DMV of Jessie Mendoza match the hair and body style of the gunman with the hockey mask." *Id.*  Detectives reviewed call records from Jason Goldsby's cellular telephone which showed that he had several telephone communications on September 12, 2016 with telephone number 702-280-6709.  Detectives found through research that Defendant Mendoza had provided this number to pawn shops as his personal contact number.  Based on the foregoing, Detective Beveridge believed that Defendant Mendoza was the gunman during the September 12, 2016 EZ Pawn robbery.

Detective Beveridge requested permission to execute the warrant at nighttime for the following reason:  "Jessie Mendoza is not currently in police custody.  Detectives will attempt to locate Mendoza for purposes of collecting DNA samples and it is unknown at what time of the day Detectives will find him.  If a night time search clause is not approved the Detectives will have to release Mendoza without collecting DNA if he is found during the night time hours." *Id.* at pg. 566.  The justice-of-the-peace issued the search warrant with the nighttime search clause on October 21, 2016.  *Id.* at pgs. 568-69.

**2.     October 22, 2016 Search Warrant for Defendant's Residence.**

On October 22, 2016 at 7:28 P.M., Detective Beveridge applied to the same justice-of-the-peace by telephone for a warrant to search a residence in Henderson, Nevada where Defendant Mendoza was believed to reside, and to seize the following items: (1) paperwork to establish the identities of the persons residing at the residence; (2) written correspondence, diaries, financial records, wills and like items; (3) firearms; (4) black tee shirt with white unique design; and (5) white long shorts. *Motion to Suppress* (ECF No. 36), *Exhibit A, October 22, 2016 Telephone Search*

*Warrant Affidavit.* Detective Beveridge again referenced a series of armed robberies of EZ Pawn

stores beginning on March 12, 2016. He further stated:

> In one incident, which was documented under LVMPD Event #160912-3481, the suspects were seen dumping a stolen vehicle after committing an EZ Pawn robbery at [address redacted], Las Vegas, Nevada. During that robbery four suspects were seen on surveillance entering the EZ Pawn. Three suspects went directly to the jewelry display cases and began smashing them out taking various items of jewelry and watches. The fourth suspect seen on video as [sic] a Hispanic male adult, weighing over 200 pounds, wearing a Jason style hockey mask, was armed with a black handgun, and was standing guard at the EZ Pawn front door. After the robbery was over the suspects entered a Toyota van and fled to the Mariana's Supermarket parking lot. Suspect four was seen on the Mariana's parking lot video surveillance walking over to the trash dumpster and throwing all the clothing items worn by the robbery suspects along with the hockey mask in the dumpster.

*Exhibit A, Affidavit*, pg. 557.

Later in the affidavit, Detective Beveridge refers to the date of the above described robbery as

September 12, 2016. *Id.* at pg. 558. Detective Beveridge stated that crime scene investigators

recovered the clothing and hockey mask from the dumpster and were able to extract DNA from

various clothing items. He noted that "[a]fter dumping the robbery clothes suspect number four is

seen in the video wearing white shorts and a distinctive black tee shirt with a white design on the

front and back of the shirt." *Id.* at pgs. 557-58.

Detective Beveridge stated that Jason Goldsby was identified as one of the individuals

responsible for the robberies and was arrested together with three other suspects following an EZ

Pawn robbery on October 7, 2016. None of the four suspects arrested on October 7, 2016 matched

the physical description of the number four suspect from the 09-12-16 robbery. During interviews

with the suspects, Jessie Mendoza was identified as the hockey mask wearer in the 09-12-16 robbery.

A social media and Nevada DMV photo search was conducted on Jessie Mendoza and his hairstyle

and his body style matched that of the hockey mask suspect. Detective Beveridge stated that a check

of recent pawn activity showed that Defendant Mendoza provided a phone number as his primary

cell phone. This number was cross checked with the call detail logs of Jason Goldsby and on several

of the robbery dates in the series of related robberies, phone calls were made back and forth from

Goldsby and Mendoza. *Id.* at pgs. 558-59.

4

1    Detective Beveridge stated that on October 22, 2016, he conducted surveillance at a residence

2    that was the last known address of Mr. Mendoza.  At approximately 4:15 P.M., he saw Mr. Mendoza

3    and his girlfriend, Angela Obidzinski, and two small children exit the residence, enter Ms.

4    Obidzinski's automobile, and drive away.  A vehicle stop was conducted a short distance away.

5    Detective Beveridge spoke to Angela who stated that she and Mr. Mendoza were back together and

6    were staying at the residence.  Detective Beveridge stated that a current TPO [temporary protection

7    order] prohibited Mendoza from contacting Angela.  Mr. Mendoza was therefore arrested and

8    transported to the Henderson jail where Detective Beveridge executed the DNA search warrant.  He

9    also informed Mr. Mendoza of the current robbery investigation and told him that the police had

10   phone records and DNA evidence that would show his involvement in the robberies.  Mr. Mendoza

11   was booked into jail for the TPO violation.  Detective Beveridge stated that while he was en route to

12   LVMPD Headquarters, he was informed by Henderson police officers that Mendoza called Angela

13   and told her to get rid of her phone.  He also noted that the video surveillance showed that Defendant

14   Mendoza threw away clothes that were used in the September 12, 2016 robbery.  *Id.* at pgs. 559-60.

15       Based on the foregoing information, Detective Beveridge requested a warrant to search the

16   residence for evidence relating to the September 12, 2016 robbery.  He also requested a night time

17   search clause because "Jessie Mendoza is currently attempting to have his girlfriend, Angela, remove

18   evidence linking him to the robbery events.  If detectives wait until morning to serve this warrant the

19   possibility of evidence being destroyed or removed is greatly improved." *Id.* at pg. 560.  The justice-

20   of-the-peace granted the search warrant, including the provision for a nighttime search.  *Id.* at pgs.

21   561-62.

22       **3.    Detective Beveridge's April 5, 2017 Hearing Testimony.**

23       Detective Beveridge testified at the hearing on April 5, 2017 that he conducted surveillance

24   of the residence located at 560 Fork Mesa in Henderson, Nevada on October 22, 2016.  The purpose

25   of the surveillance was to locate Defendant Mendoza and execute the search warrant for the buccal

26   swab.  Detective Beveridge was wearing plain clothes and was in an unmarked automobile.  Prior to

27   going to the subject residence, he conducted computer research and determined that a domestic

28   violence temporary protection order had been issued and served on Mr. Mendoza.  The applicant for

1  the TPO was Angela Obidzinski.   The TPO also referred to Ms. Obidzinski's children.  The TPO

2  required Mr. Mendoza to stay 100 yards away from the Fork Mesa residence and also from Ms.

3  Obidzinski's place of employment, the children's school, and another address that may have been an

4  address for Ms. Obidzinski's family.  After obtaining the information about the TPO, Detective

5  Beveridge investigated publically available social media sites to find out more information about Ms.

6  Obidzinski and the children, including photographs.

7      Detective Beveridge testified on cross-examination that he ran a search for information on

8  Defendant Mendoza in law enforcement databases, including one known as "CJIS." The CJIS

9  database disclosed the existence of the TPO against Mr. Mendoza.  The database provided a

10  summary of the TPO, including the dates it was issued and served on Defendant, when it expired,

11  and the restrictions imposed on Defendant.  Detective Beveridge testified that he relied on this

12  information in believing that Defendant Mendoza was subject to an existing TPO that prohibited him

13  from being in the presence of Ms. Obidzinski or within 100 yards of her residence.  This information

14  was apparently confirmed by the Henderson Police when they subsequently placed Defendant under

15  arrest for violating the TPO.  Detective Beveridge testified that Nevada law mandates that a person

16  subject to a TPO be arrested if the officer observes a violation of the order.

17      After conducting surveillance for approximately one hour, Detective Beveridge observed

18  Defendant Mendoza, Ms. Obidzinski and their two daughters exit the Fork Mesa residence and enter

19  an automobile.  Detective Mendoza recognized Mr. Mendoza, Ms. Obidzinski and the children from

20  the photographs he had obtained during his research.  Detective Beveridge followed the automobile

21  as it drove out of the residential neighborhood.  Once the automobile was on Major Avenue,

22  Detective Beveridge activated the emergency lights and siren on his vehicle and signaled Mr.

23  Mendoza to pull over.  Mr. Mendoza initially pulled over, and Detective Beveridge radioed for

24  Henderson police to provide back-up support.  Approximately 20 seconds after stopping, Mr.

25  Mendoza drove off down the roadway.  Detective Beveridge again followed the automobile.  Mr.

26  Mendoza hung his cell phone out of the vehicle's window and it appeared to Detective Beveridge

27  that Defendant was attempting to film him.  Mr. Mendoza then pulled back over to the side of the

28  roadway and stopped.  Henderson police in a marked patrol car arrived approximately 20 seconds

1  after Mr. Mendoza pulled over the second time.  Mr. Mendoza thereafter exited the automobile,

2  came back to Detective Beveridge's location where he was put in handcuffs and then placed in the

3  detective's car.  While Detective Beveridge dealt with Mr. Mendoza, the Henderson police officers

4  completed paperwork to arrest Mr. Mendoza for violation of the TPO.  Detective Beveridge

5  transported Mr. Mendoza to the Henderson detention center.

6        Detective Beveridge testified on cross-examination that he informed Mr. Mendoza of his

7  *Miranda* rights.  He then told Defendant Mendoza that he was investigating the "Goldsby robberies."

8  He asked Defendant if he knew what had transpired with respect to Mr. Goldsby.  Although Mr.

9  Mendoza initially stated that he wanted speak with counsel, Detective Beveridge testified that he

10 continued to speak to the detective, asked questions, and arguably made incriminating statements.

11 Defendant has moved to suppress his post-arrest statements on the ground that they were obtained in

12 violation of his *Miranda* rights.  The Government stated at the hearing that it does not intend to

13 introduce Defendant's custodial statements in its case in chief.  Detective Beveridge also testified

14 that he seized Defendant Mendoza's cellular telephone when he was taken into custody.  He testified,

15 and the Government's counsel confirmed, that a warrant was later obtained to search the cell phone.

16 The phone was locked, however, and the Government does not have the password to unlock it.  The

17 phone, therefore, has not been searched.

18                         **DISCUSSION**

19    **1.    Whether the Stop and Arrest of Defendant Violated the Fourth
            Amendment.**

20

21        The Fourth Amendment to the United States Constitution protects "the right of the people to

22 be secure in their persons, houses, papers, and effect, against unreasonable searches and seizures."  It

23 further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or

24 affirmation, and particularly describing the place to be searched, and the persons or things to be

25 seized."  When a police officer has probable cause to believe that a person has committed even a

26 minor crime in his presence, the person's arrest is constitutionally reasonable.  *Virginia v. Moore*,

27 553 U.S. 164, 171, 128 S.Ct. 1598, 1604 (2008).  Police officers may also rely on information in law

28 enforcement databases or record keeping systems regarding the existence of arrest warrants, criminal

1  convictions or similar information so long as the reliance is reasonable under the circumstances.

2  *Herring v. United States*, 555 U.S. 135, 145–47, 129 S.Ct. 695, 703–04 (2009).  Even if the

3  information relied on is incorrect, the evidence need not be excluded.  *Id.* (holding that police officer

4  reasonably relied on incorrect information from a neighboring county sheriff's office that there was

5  an outstanding warrant for defendant' arrest).

6        In this case, Detective Beveridge received information from the CJIS database that Defendant

7  Mendoza was subject to an existing TPO that prohibited him from being within 100 yards of Ms.

8  Obidzinski's residence.  The intentional violation of such an order is a gross misdemeanor.  *See*

9  Nevada Revised Statute (NRS) § 200.591.5(a).  There is no evidence that the information regarding

10 the TPO was incorrect.  Detective Beveridge saw Defendant Mendoza exit the residence in the

11 company of Ms. Obidzinski.  He therefore had probable cause to arrest Defendant for violating the

12 TPO.  The stop and ensuing arrest of Defendant did not violate the Fourth Amendment.

13     **2.**    **Whether the Search Warrants for the Buccal Swab and Defendant's**
            **Residence Were Supported by Probable Cause.**

14

15       Defendant Mendoza argues that the search warrants for the buccal swab and search of his

16 residence were not supported by probable cause and that the evidence obtained as a result of those

17 warrants should be suppressed.  Whether a search warrant is supported by probable cause must be

18 determined from the "four corners" of the affidavit.  *United States v. Anderson*, 453 F.2d 174, 176–

19 77 (9th Cir. 1971); *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Ci. 2005); *United States v.*

20 *Luong*, 470 F.3d 898, 904–05 (9th Cir. 2006).  In deciding whether to issue a search warrant, the

21 magistrate or judicial officer is required to make a practical, commonsense decision whether given

22 all of the circumstances set forth in the affidavit, there is a fair probability that contraband or

23 evidence of a crime with be found on the person or at the place to be searched.  *United States v.*

24 *Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct.

25 2317 (1983)).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a

26 'substantial basis for . . . conclud[ing] that probable cause existed."  *Id.*  As stated in *Illinois v.*

27 *Gates*, "[s]ufficient information must be presented to the magistrate to allow that official to

28 determine probable cause; his action cannot be the mere ratification of the bare conclusions of

1    others." 462 U.S. at 239, 103 S.Ct. at 2332. "'[A] warrant affidavit must set forth particular facts

2    and circumstances ... so as to allow the magistrate to make an *independent* evaluation of the matter.'"

3    *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (quoting *Franks v. Delaware*,438 U.S.

4    154, 165, 98 S.Ct. 2674 (1978)). The magistrate's determination of probable cause is entitled to

5    great deference by the reviewing court. *Krupa*, 658 F.3d at 1177 (citing *Millender v. County of Los*

6    *Angeles*, 620 F.3d 1016, 1025 (9th Cir. 2010); *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir.

7    2007); and *United States v. Battershell*, 457 F.3d 1048, 1050 (9th Cir. 2006)).

8         Detective Beveridge's October 21, 2016 affidavit in support of the search warrant for the

9    buccal swab provided the following information in support of probable cause:  (1) The September

10   12, 2016 EZ Pawn store robbery was one of a series of robberies committed by the same gang; (2)

11   surveillance video from the Mariana's grocery store parking lot on September 12, 2016 showed the

12   robbers exit the stolen vehicle used in the robbery and enter another vehicle.  One of the robbers

13   dropped clothing and a hockey mask into a dumpster that the video from the EZ Pawn store showed

14   was the same clothing worn by the robbers.  DNA was obtained from that clothing; (3) Jason

15   Goldsby was identified as one of suspects in the earlier March 10, 2016 EZ Pawn robbery; (4)

16   Goldsby, D.P., and two other individuals were taken into custody after committing another EZ Pawn

17   robbery on October 7, 2016; (5) D.P. told the police that the person wearing the hockey mask during

18   the September 12, 2016 robbery was named "Jess" and he identified a photograph of Defendant

19   Mendoza as the person who wore the hockey mask during the September 12th robbery; (6) video

20   from the EZ Pawn robbery showed that the person wearing the hockey mask appeared to be a heavy

21   set Hispanic male with a shaved head; (7) photographs of Defendant Mendoza matched this general

22   description of the robber; and (8) records for Goldsby's telephone number and a telephone number

23   identified as one used by Defendant Mendoza showed several calls between their numbers on

24   September 12, 2016.

25         The information provided by Detective Beveridge in his October 22, 2016 telephonic

26   affidavit was substantially the same as that provided in his October 21st written affidavit–with the

27   additional information regarding Defendant's arrest on October 22nd, and the evidence connecting

28   him to the residence to be searched.  The October 22, 2016 affidavit was more general in stating that

"[d]uring interviews with suspects in custody, Jessie Mendoza was identified as the hockey mask wearer in the 09-12-16 robbery." *Exhibit A, Affidavit*, pg. 558. It also differed from the previous affidavit in stating that there was telephone contact between Justin Goldsby's and Defendant's telephone numbers on "several of the robbery dates in the series," rather than on September 12, 2016 as stated in the October 21st affidavit. Both affidavits provided only general assertions connecting the September 12, 2016 robbery and the earlier EZ Pawn robberies to a single gang of robbers. Although the telephonic search warrant affidavit was submitted to the same justice-of-the-peace one day after the affidavit for the buccal swab warrant, Detective Beveridge did not incorporate his first affidavit into the telephonic affidavit. Given the four corners rule, the determination whether probable cause existed to search Defendant's residence must be made solely from the information contained in the telephonic affidavit. *Cf. United States v. Sitton*, 968 F.2d 947, 956 (9th Cir. 1992), *abrogated on other grounds by Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035 (1996) (earlier affidavit attached to the second affidavit and incorporated into it by reference could be considered in determining probable cause).

The facts set forth in the October 21, 2016 affidavit provided a substantial basis on which to conclude that there was probable cause to believe that Defendant Mendoza was the robber depicted in the September 12, 2016 surveillance video wearing the hockey mask. The affidavit stated that EZ Pawn store surveillance video showed that the robber wearing the hockey mask appeared to be a heavy set Hispanic male with a shaved head. The affidavit indicated that this appeared to be the same person shown in the Mariana's store surveillance video dropping clothing and a hockey mask into a dumpster. D.P. identified a photograph of Defendant Mendoza as the robber known to him as "Jess," whom he also identified as the robber wearing the hockey mask during the September 12, 2016 robbery. The affidavit did not explain the basis of D.P.'s knowledge. The implication is that D.P. was present during the September 12, 2016 robbery. The affidavit also connected Defendant Mendoza to the robbery based on the September 12, 2016 telephone calls between his phone and that of Justin Goldsby.

The October 22nd telephonic affidavit was more vague in stating Defendant Mendoza was identified during interviews with the suspects in the October 7th robbery as the robber wearing the

1   hockey mask in the September 12, 2016 robbery.  The affidavit was also more vague with respect to

2   connecting the phone calls between Goldsby's and Defendant's phones on the day of the subject

3   robbery.  This vagueness in the telephonic affidavit lessens the strength of the information

4   supporting probable cause in the second affidavit and therefore makes it more debatable whether

5   there as a substantial basis for the justice-of-the-peace's conclusion that probable cause existed.

6       Defendant also argues that the telephonic affidavit did not establish a sufficient nexus

7   between the items to be seized and the place to be searched.  *Motion* (ECF No. 36), pg. 10.

8   Defendant relies on *United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) and *United States v.*

9   *Hendricks*, 743 F.2d 653 (9th Cir. 1984).  In *Grant*, the police obtained a warrant to search the

10  defendant's house for a handgun believed to have been used in a murder that occurred nearly nine

11  months earlier.  There was no evidence connecting the defendant to the murder, although there was

12  evidence to connect one or two of his sons.  The sons did not reside with the defendant and only one

13  of the sons stayed at the defendant's house.  This, however, did not occur until six months after the

14  murder.  The murder weapon was not found during the search, but two other hand guns and

15  ammunition were found, and the defendant was charged with being a felon in possession of firearms

16  and ammunition in violation of 18 U.S.C. § 922(g)(1).  The court held that the affidavit did not

17  provide a fair probability that the gun or ammunition from the homicide would be found in the

18  defendant's home.  *Hendricks* involved a scenario in which a magistrate issue a search warrant for

19  the defendant's residence that was conditional on a box containing narcotics being picked up by the

20  defendant and brought to his house.  The court held that at the time the warrant was issued, the

21  magistrate did not have sufficient grounds to believe that the defendant would pick up the box and

22  take it to his house.  Therefore, the warrant was not supported by probable cause.  *Hendricks*, 743

23  F.2d at 655.

24      This case is distinguishable from *Grant* and *Hendricks*.  The police applied for the search

25  warrant one month and ten days after the September 12, 2016 robbery.  They sought permission to

26  seize firearms potentially used in the robbery and particular items of clothing worn by the robber

27  who guarded the door to the EZ Pawn store and who disposed of other articles of clothing and the

28  hockey mask after the robbery.  If Defendant Mendoza was the robber seen on the surveillance video,

then it was reasonable to believe that such items would still be in his possession and located in his current place of residence.[1]  Defendant was observed leaving the residence with his girlfriend and their children on the date the warrant application was made.  The girlfriend also told Detective Beveridge that she and Defendant were again residing together in the residence.  Accordingly, there was a reasonable nexus between the items to be seized and the place to be searched.

If the facts set forth in the search warrant affidavit are not sufficient to support a finding of probable cause, the good faith exception to the exclusionary rule does not require suppression of the evidence if the police officers had an objectively reasonable basis to rely on the validity of the warrant.  *United States v. Leon*, 468 U.S. 897, 922–25,104 S.Ct. 3405, 3420-22(1984); *United States v. Grant*, 682 F.3d at 836.  The good faith exception does not apply, however, if (1) the issuing judge was misled by information in the affidavit that the affiant knew was false, or would have known was false but for his reckless disregard of the truth.  *Leon*, 468 U.S. at 923,104 S.Ct. at 3421 (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978)).  The exception also does not apply if (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient, such as failing to state the particular the place to be searched or the things to be seized, that the executing officers could not reasonably presume it to be valid.  *Id.* Factors (2), (3) and (4) do not negate application of the good faith exception in this case. The affidavits stated that Defendant matched the general physical description of the robber.  At least one of the suspects in the October 7, 2016 robbery identified Defendant as the robber wearing the hockey mask during the September 12, 2016 robbery.  Telephone call records connected Defendant to another robbery suspect, Goldsby, on the day of the September 12, 2016 robbery or on the days that previous robberies were committed.  It was therefore objectively reasonable for the officers to believe that the search warrants were valid.

. . .

---

[1] The warrant return states that one black shirt and two pairs of white shorts were seized during the search. *Motion* (ECF No. 36), *Exhibit D.*

1

### 3.    Whether the Nighttime Search Clauses Were Invalid.

Defendant argues that the nighttime search clauses in the warrants were not supported by reasonable grounds and were therefore invalid.  Rule 41(e)(2)(ii) of the Federal Rules of Criminal Procedure states that "[t]he warrant must command the officer to:  execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time."  Daytime is defined as the hours between 6:00 A.M. and 10:00 P.M.  Rule 41(a)(2)(B).  The mere existence of probable cause to believe that drugs or weapons will be found at the premises does not justify a nighttime search.  *Bravo v. City of Santa Monica*,  665 F.3d 1076, 1085–86 (9th Cir. 2011).  A nighttime search may be authorized only if the affidavit shows that there are exigent circumstances.  This includes information showing that the object of the search or his associates are likely to destroy evidence if the warrant is not immediately executed.  *United States v. Stefanson*, 648 F.2d 1231, 1236 (9th Cir. 1981).  *See also United States v. Fowlkes*, 804 F.3d 954, 970 (9th Cir. 2015) ("Exigent circumstances include those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent . . . the destruction of relevant evidence.") (internal quotation marks and citations omitted).

Whether exigent circumstances existed to justify the nighttime search clause in the buccal swab search warrant is a moot point.  Defendant was arrested in the daytime hours and the buccal swab was thereafter obtained from him at the jail.  The nighttime clause was not invoked.  The search of Defendant's residence was apparently executed at night.[2]  Detective Beveridge informed the judge that the nighttime search clause was necessary because Defendant had already called his girlfriend from jail and told her to get rid of her phone.  He also noted that Defendant had previously thrown away clothes used in the robbery.  *Motion* (ECF No. 36), *Exhibit A, Affidavit*, pg. 559.  This information provided a substantial basis to support the judge's authorization for a nighttime search.  The search of the residence at nighttime did not violate the Fourth Amendment.

. . .

---

[2] The Court has not been informed what time the search of the residence occurred. The Government has not asserted, however, that it occurred during the daytime hours.

**4.    Defendant's Request for a *Franks* Evidentiary Hearing.**

Defendant Mendoza argues that the affidavits contained material misrepresentations or omissions of fact that require the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978). "Under *Franks*, a criminal defendant has the right to challenge the veracity of statements made in support of an application for a search warrant." 438 U.S. at 155–56. To prevail on a *Franks* challenge, the defendant must establish two things by a preponderance of the evidence; first, that the "affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant[,]" and second, that the false or misleading statement or omission was material, *i.e.*, "necessary to finding probable cause." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (quoting *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)). "If both requirements are met, 'the search warrant must be voided and the fruits of the search excluded. . . .'" *Id.* (quoting *Franks*, 438 U.S. at 156). The allegation of a *Franks* violation does not automatically entitle the defendant to an evidentiary hearing. *Franks* states:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

438 U.S. at 171.

The Ninth Circuit has articulated five requirements that a defendant must satisfy to justify an evidentiary hearing: (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause. *United States v. Dicesare*, 765 F.2d 890, 894–

95 (9th Cir. 1985). If the defendant makes a substantial showing that the affidavit contains

intentionally or recklessly false statements, "and if, when the material that is the subject of the

alleged falsity is set to one side, there remains sufficient content in the warrant affidavit to support a

finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72. If the remaining

content is insufficient to support probable cause, however, then the defendant is entitled to an

evidentiary hearing. *Id.*

Intentional or reckless omissions may also provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007) states:

> "A search warrant, to be valid, must be supported by an affidavit establishing probable cause." *United States v. Stanert,* 762 F.2d 775, 778 (9th Cir.1985). In *Stanert,* we applied the rationale of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to hold that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Stanert,* 762 F.2d at 781 ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.") In addition, the defendant must show that the "affidavit, once corrected and supplemented," would not "provide ... a substantial basis for concluding that probable cause existed" to search defendant's residence. *Id.* at 782.

Clear proof of deliberate or reckless omissions is not required to obtain an evidentiary

hearing. *United States v. Stanert*, 762 F.2d at 781. The "omission rule," however, does not require

that the affiant address every possible theory, no matter how unlikely, that would controvert the

affiant's good-faith belief that probable cause exists for the search. *United States v. Craighead*, 539

F.3d 1073, 1081 (9th Cir. 2008).

Defendant argues that the following matters constituted material misrepresentations or

omissions in the search warrant affidavits:

1. The affidavits stated that the suspect wearing the hockey mask was Hispanic. The

affidavit did not inform the justice-of-the-peace that eyewitnesses identified the suspect wearing the

hockey mask as a black male. *Motion* (ECF No. 36), pg. 13. In support of this assertion, Defendant

cites the September 12, 2016 Henderson Police Department report which stated:

. . .

15

On 9/12/16 at approximately 1939 hours, 4 Black Males entered the EZ Pawn at [redacted] wearing masks and gloves.  1 male, wearing a gray sweatshirt, black pants, and a "Jason" style hockey mask. . . .  The first male with the hockey mask stood by the front door and acted as a lookout and had a handgun in his hand per video surveillance.

*Motion* (ECF No. 36)*, Exhibit E*, pg. 346.

Although Defendant states that "eyewitnesses" identified the robbers as four black males, the police report indicates that the description of the robbers was based on a review of the EZ Pawn store's surveillance video.

2.  The affidavit stated that the "fourth suspect" wearing the hockey mask in the September 12, 2016 robbery "was seen on the Mariana's parking lot video surveillance walking over to the trash dumpster and throwing all the clothing items worn by the robbery suspects along with the hockey mask in the dumpster."  Defendant asserts that the surveillance video from Mariana's was of very poor quality and there is no way to tell from the video who the person is, "let alone to unequivocally state under oath to a judge that the person in the Mariana's surveillance video is 'suspect number four.'"  *Motion* (ECF No. 36), pg. 13.  Defendant has attached still screen shots from the Mariana's surveillance video to support his argument.  *Motion* (ECF No. 36)*, Exhibit F.*

3.  The affidavits omitted information as to how law enforcement officers identified Defendant Mendoza as a suspect in the robbery and connected him to Defendant Goldsby before the officers obtained his photograph and showed it to D.P. on October 7, 2016.

4.  The affidavit for the search of Defendant's residence was misleading because it stated that "[d]uring the interviews with the suspects in custody Jessie Mendoza was identified as the hockey mask wearer in the 09-12-16 robbery."  *Motion* (ECF No. 36), pg. 14.  Defendant argues that this statement was misleading because it (1) indicates that all of the suspects arrested on October 7, 2016 identified Defendant Mendoza as the person wearing the hockey mask during the September 12, 2016 robbery; (2) omits any details concerning D.P.'s limited identification of only a person named Jess and the detective's one man photo lineup; and (3) omits any indication that detectives had identified Mr. Mendoza as a suspect before the October 7, 2016 robbery and resulting interrogations.

5.  The affidavits omitted information about how the detectives located a cell phone number associated with Mr. Mendoza which they then determined had been in contact with a phone number

used by Goldsby.  *Motion* (ECF No. 36), pg. 15.

The Government did not address Defendant's arguments in support of his request for a *Franks* hearing in its original response to the motion to suppress.  The Government only addressed the issue of whether an evidentiary hearing should be conducted to determine whether the stop of Defendant's vehicle was lawful.  *See Response* (ECF No. 41), pgs 13-14.  Defendant argued at the April 5, 2017 hearing that given the Government's failure to respond to his arguments, the *Franks* hearing should be granted.  The Court, however, was doubtful that Plaintiff had made the requisite showing for a *Franks* hearing, and therefore invited the parties to file supplemental briefs.  The parties' supplemental briefs are unhelpful.  Defendant did not further explain why an evidentiary hearing is justified.  *See Supplement to Motion to Suppress* (ECF No. 63).  The Government provided a recitation of the legal requirements for finding a *Franks* violation, but, once again, did not address Defendant's factual assertions as to why an evidentiary hearing should be granted.  *Response* (ECF No. 64).  Contrary to the Government's repeated assertions, the Court did not hold that Defendant has failed to show that a *Franks* hearing is required.  If the Court had reached that conclusion, it would not have invited supplemental briefs.

Defendant's third, fourth and fifth factual assertions do not allege misrepresentations or omissions that justify an evidentiary hearing.  The affidavits stated that the detectives identified Mendoza's telephone number through his contacts with pawn stores in which he had provided the telephone number as his primary contact number.  Defendant has made no showing that this information is false.  Defendant makes a valid point that the telephonic affidavit in support of the search warrant for the residence could be read as indicating that more than one suspect in the October 7, 2016 robbery identified Defendant Mendoza as the robber wearing the hockey mask in the September 12, 2016 robbery.  The first affidavit stated that only D.P. identified Mendoza. *Motion* (ECF No. 36), *Exhibit B, Affidavit*, pg. 565.  Defendant has not provided any evidence that the first affidavit misrepresented the nature of D.P.'s identification of Defendant.  D.P. was shown a single photograph of Mr. Mendoza and identified him as the robber wearing the hockey mask in the September 12, 2016 robbery.  If the telephonic affidavit was corrected to reflect the information in the first affidavit, it would still provide evidence supporting the identification of Defendant as the

17

1 robber wearing the hockey mask.

2    Defendant argues that the affidavits omitted information as to how that detectives initially

3 identified Mendoza as a robbery suspect.  The absence of such information, however, does not

4 require a *Franks* hearing.  Detective Beveridge asserted in the affidavits that there was probable

5 cause to believe that Defendant Mendoza was the robber wearing the hockey mask during the

6 September 12, 2016 robbery and he set forth the facts upon which the assertion was made.  What

7 first led the police to suspect that Defendant was involved in the robbery is not essential to the

8 finding of probable cause, unless Defendant can also show that the omitted information would have

9 materially undermined a finding of probable cause.

10    Defendant's first and second assertions raise legitimate questions as to whether the affidavits

11 omitted or misrepresented information that was material to the identification of Defendant as the

12 robber wearing the hockey mask in the September 12, 2016 robbery.  The first assertion is the

13 omission of the statement in the police report that the four robbers were all "black males."  The

14 second assertion is whether Defendant could be reasonably identified as the robber wearing the

15 hockey mask in the surveillance video from the Mariana's parking lot.  Both of these questions may

16 potentially be resolved by viewing the surveillance video from the EZ Pawn store and the Mariana's

17 parking lot.  It is reasonably possible for an Hispanic individual to be erroneously identified as

18 African-American, especially if the individual is wearing a mask.  Even if the surveillance video

19 from the Mariana's parking lot is of poor quality, it may still be possible to identify the individual

20 shown in that video as the same person wearing the hockey mask in the EZ Pawn robbery video.

21 The Court will therefore conduct an evidentiary hearing regarding these two issues.  The Court

22 expects the parties to present the surveillance videos from the EZ Pawn store and the Mariana's

23 parking lot (assuming that they are still available).  Detective Beveridge should also testify regarding

24 these matters.

## CONCLUSION

26    Detective Beveridge had probable cause to stop and arrest Defendant Mendoza on October

27 22, 2016 for a violation of the the temporary protection order.  Any evidence acquired as a result of

28 that stop was not illegally seized.  Based on the information contained in the search warrant

18

1  affidavits, the justice-of-the-peace had a substantial basis for concluding that probable cause existed
2  to support the issuance of the search warrants for the buccal swab and Defendant's residence.
3  Furthermore, the police officers had an objectively reasonable basis to believe in the validity of the
4  warrants so long as the Detective Beveridge did not intentionally or recklessly misrepresent or omit
5  any material facts.  The validity of the nighttime search clause in the buccal swab warrant is moot.
6  The telephonic affidavit in support of the search warrant for Defendant's residence provided exigent
7  circumstances that justified a nighttime search.

8       The Court will conduct an evidentiary hearing to determine whether the information in the
9  police report that the suspects in the September 12, 2016 were black males was intentionally or
10 recklessly omitted from the affidavits and whether such omission was material.  The Court will also
11 conduct an evidentiary hearing to determine whether the statements in the affidavits identifying the
12 individual in the Mariana's parking lot surveillance video as the same person wearing the hockey
13 mask during the robbery was false, and, if so, whether the false statement was intentionally or
14 recklessly made.  The other grounds asserted by Defendant do not justify a *Franks* evidentiary
15 hearing.

16                                    **RECOMMENDATION**

17      **IT IS RECOMMENDED** that Defendant's Motion to Suppress (ECF No. 36) be **denied**,
18 except in regard to the issues on which the Court will conduct a *Franks* evidentiary hearing.  The
19 Court will issue further findings and recommendations after the evidentiary hearing is concluded.

20                                         **ORDER**

21      **IT IS HEREBY ORDERED** that an evidentiary hearing pursuant to *Franks v. Delaware*,
22 438 U.S. 154, 98 S.Ct. 2674 (1978) is set for **May 25, 2017 at 9:30 a.m.** in Las Vegas Courtroom
23 3A.

24                                        **NOTICE**

25      Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in
26 writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held
27 that the courts of appeal may determine that an appeal has been waived due to the failure to file
28 objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also

held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 10th day of May, 2017.

GEORGE FOLEY, JR.
United States Magistrate Judge

20